33037, 33038.   CALLISON *v.* SAVANNAH & ATLANTA RAILWAY COMPANY *et al.;* and *vice versa.*

Decided November 28, 1950.

*Hilton & Hilton,* for plaintiff.

*Hitch, Morris, Harrison & Smith, J. Henry Howard,* for defendant.

MacINTYRE, P. J. "Where it is shown that injury was inflicted by the running of a railroad train, a presumption of negligence arises against the railroad, but the presumption is overcome by evidence on behalf of the railroad showing the exercise of ordinary and reasonable care and skill, and, in the absence of any evidence to discredit or contradict this evidence or to show negligence on the part of servants of the railroad, it is controlling and a verdict for the plaintiff is unauthorized." *Atlantic Coast Line R. Co.* v. *Martin,* 79 *Ga. App.* 194 (53 S. E. 2d, 176), and cit., particularly, *Georgia R. & Banking Co.* v. *Wall,* 80 *Ga.* 202 (7 S. E. 639).

To describe the scene and locale of Callison's death, it appears from the evidence without dispute that the Sylvania Lumber Company owned property on both sides of the railroad tracks. This property was fenced on both sides of the railroad and the fences nearest the railroad tracks were parallel to the tracks. Along the fence on the west side of the tracks, which runs southeasterly and northwesterly, is a footpath, and nearer the tracks on the west side of the tracks is a second footpath which parallels the fence, the tracks, and the first path. These two paths on the west side of the tracks connect at two points. The first point of connection is at what is known as the north gate of the lumber company's property on the west side of the tracks. The point of connection of the two paths here is near the fence and gate. The second point of connection of the two paths on the west side of the tracks is at a point about 200 feet north of

the south gate of the lumber company's property on the west side of the tracks. The point of connection of the two paths on the west side of the tracks at the south gate is near the tracks. The north gate is apparently used for pedestrian traffic alone. The south gate is used for both vehicular and foot traffic. At the point south of the north gate the two paths mentioned above converge and cross the tracks of the railroad. There seems to have been no well defined path which crosses the tracks at the north gate, from west to east or vice versa, though there was nothing at this point to have prevented one so choosing from crossing the tracks at this point near the north gate, and using a third path which paralleled the tracks on the east side. The distance from the north to the south gates was variously estimated, but, from a scaled drawing which was introduced in evidence, it appears to be approximately 425 feet. Callison's body was found within a few feet ("three or three and one-half feet") from the tracks on the west side of the tracks on or near the path at the north gate. He was dead when found there, and, upon examination, it was discovered that there was a fracture at the base of his skull on the left side and the ribs on his left side were entirely caved in. At a point about 26 feet from where his body was found, a wet spot on the ground was discovered at the very end of one of the crossties on the west side of the track. This spot was believed by some of the witnesses to have been made by Callison's having vomited there. Between the point where the vomit was found and the body was found there were evidences upon the ground of someone or something having been dragged along the ground. A bench which customarily stood near the path at the north gate appeared to have been knocked out of position in a northerly direction.

From other evidence it appeared that Callison, in the performance of his duties as night watchman for the lumber company, was required to "punch" eight clocks on the lumber company's premises at hourly or half-hourly intervals. Seven of the clocks were located on the west side of the tracks and one was located on the east side. This, of course, necessitated Callison's crossing the railroad tracks some twenty-four times during a duty of twelve hours. It appeared that the property on the west side of the tracks was entirely enclosed by a fence

and the north and south gates of this property were kept locked, and Callison carried the key. The major portion of Callison's time was, however, spent on the west side of the tracks within the lumber company's fenced property.

The train which it is believed caused Callison's death customarily passed the lumber company's property during the early morning hours and most frequently at about 3 a. m. It appeared that a silent friendliness existed between Callison and the members of this train crew, as Callison was accustomed to flash his light at the train each night as it passed and the various members of the train crew returned his salute by flashing their lights to him. The train crew was accustomed to expect, and watched for this salute from Callison, whether he happened to be on the east or west side of the railroad at the time the train passed.

Callison was last seen alive, so far as the evidence reveals, at about 2 a. m. when he drank coffee with two other employees of the lumber company in the boiler room of the lumber company on the west side of the tracks. It appeared that he had been suffering from an ulcerated stomach for some time and on this particular night when he drank his coffee he regurgitated a portion of it, though he did not complain of being ill. When he had finished his coffee at about this hour, 2 a. m., he set out on his rounds to punch the clocks. There is no evidence of his actions between this hour and the time he was found dead.

So far as the record shows, there was no eyewitness to Callison's death. The whole evidence that he was killed by the train in question is entirely circumstantial. Both gates on the west side of the track were found locked after the discovery of his body. It seems to be the theory of the plaintiff that Callison had crossed to the east side of the tracks and was returning along the path which parallels the tracks on the west side (not the path which parallels the fence on the west side) when he became suddenly violently ill and sat down on the end of the crosstie at the end of which the "vomit" was found; and, that as a result of this sudden illness, he either reclined on the track or was unable to move and that in this helpless condition the train struck and killed him.

The members of the train crew all testified on the trial, and they all testified that the proper warning signals had been given

at each of the crossings south of the lumber company's property and that the whistle had been sounded at the crossing nearest the company's property, only a short distance south of the south gate of the property, within hearing distance of a person on the track at the point where the plaintiff contends her husband was at the time he was struck. The train crew also testified that they kept a constant lookout ahead of the train and that they had a clear view of the track within the range of the headlight of the train which was estimated to be about three hundred feet, and that they saw nothing on the track or beside the track. They testified that they were expecting to see the watchman (Callison) flash his light but he did not on that night and that they did not see him at all that night. They learned of his death the following afternoon and examined their engine thoroughly but could find no indications whatever that the engine or any of its parts had struck anyone or anything during the morning on which Callison had met his death. Members of the crew also testified that there was nothing at the time or place which would have prevented their seeing Callison if he had been on or near the track at the time the engine passed the point at which it is contended he was killed. They admitted that they were traveling at the rate of between thirty and thirty-five miles per hour, but there was no question of this speed having interfered with their ability to see Callison if he had been on or near the track at the time the engine passed. It appears that the engine was pulling a train of sixty-seven cars on the morning in question and if we accept the uncontradicted evidence of the train crew the engine did not strike Callison as he was not to be seen on or near the track when it passed the point at which it is contended he was killed. Under this state of the evidence if the plaintiff's husband was struck by the train he was struck by some part other than the engine, by one of the cars perhaps, as the train moved northwesterly along the track.

Applying the rule quoted from the *Martin* case, supra, to the evidence in this case, if there had been no evidence of Callison's illness prior to the injury in question, the jury, unquestionably, would not have been authorized to find a verdict against the railroad company and its engineer for there was no evidence at all tending to discredit or contradict the evidence of the rail-

road employees riding on the train which shows that they were in the exercise of ordinary and reasonable care and skill; and, under the facts of this case, we do not think that the evidence of Callison's illness changes the situation, for unless we simply reject the testimony of the members of the train crew, which we can not do arbitrarily, Callison was not to be seen on or near the track when the engine passed, and he was struck by one of, or part of one of, the cars; and sick or well, knowing or not knowing that the engine had passed, or intentionally or unintentionally if Callison collided with one of the sixty-seven cars being pulled by the train in an effort to cross the tracks at or near the north gate of the lumber company after the engine had passed, such circumstances would not conflict with or contradict the effect of the testimony of the employees on the train that they had exercised reasonable care and diligence. And this would be true if the decedent had collided with the train after the engine had passed at any other point along the tracks in the area in question. In brief, we think that under the facts and circumstances of this case, as shown by the evidence, a verdict was demanded in favor of the defendants.

In view of the ruling in the foregoing division of this opinion, whether the assignments of error upon the court's charge or failure to charge were erroneous or not, and we express no opinion upon those points, a new trial need not be granted in this case.

Since the judgment complained of in the main bill of exceptions must be affirmed, as the trial court did not err in overruling the motion for a new trial, the cross-bill of exceptions will not be considered and is dismissed.

*Judgment on main bill of exceptions affirmed; cross-bill of exceptions dismissed. Gardner and Townsend, JJ., concur.*